UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

**ORIGINAL**

ARTHUR D. SMART,
Inmate No. 272101

    Petitioner,

-vs-

RAYMOND BOOKER, WARDEN,
Ryan Correctional Facility,

    Respondent.

**03-70308**

PAUL D. BORMAN

MAGISTRATE JUDGE MORGAN

Honorable

U.S. DIST. COURT CLERK
EAST DIST. MICH
DETROIT

'03 JAN 24 P12 55

RECEIVED
JAN 13 2003
CLERK'S OFFICE
U.S. DISTRICT COURT

_____/

PETITION FOR WRIT OF HABEAS CORPUS

    Petitioner, Arthur D. Smart, acting in Pro Se, Pursuant to
28 U.S.C. 2241 and 28 U.S.C. 2254, Peitions this Honerable Court
to GRANT him a Writ of Habeas Corpus, and states:

    1) Petitioner Arthur D. Smart is a citizen of the State of
Michigan, currently incarcerated in a Eastern Michigan
Correctional Facility, Detroit, Michigan. Petitioner is currently
being held as a prisoner #272101. Eastern Michigan Correctional
Facility is operated by the State of Michigan in the Eastern
District of Michigan. Respondent, Raymond Booker, Warden of Ryan
Correctional Facility.

    2) Peitioner is being held in prison pursuant to his
conviction for second degree murder, assault with intent to
murder, and possession of a firearm during a felony in the Wayne
County Circuit Court, a State Court of Michigan before the
Honerable Gershwin Drain. The Honerable Gershwin Drain sentenced
Petitioner to 20 to 40 years for second degree murder, 20 to 40
years for the assault with intent to murder, these are to be
served concurrent while Petitioner was sentenced to 2 years for
felony firearms to be ran consecutive to Count 1, and count 2.

3) Petitoner has exhausted all State remedies in this case by filing an appeal of right with the Michigan Court of Appeals, and Application for Leavee to Appeal to the Michigan Supreme Court.

a) In an unpublished opinion dated June 19th, 2001, the Michigan Court Of Appeals rejected the issues in this Petition. People -vs- Smart, Michigan Court of Appeals Docket No. (attached as appendix A)

b) The Michigan Supreme Court denied Petitioner's Application for leave to Appeal on all issues raised in this Petition in a standard order on February 4th, 2002. People -vs- Smart, Michigan Supreme Court Docket No.          (Attached as Appendix B)

4)·. There have been no other appeals reguarding these conviction and sentences. Petitioner has never before sought Federal Habeas Corpus Relief with respect to these convictions and sentences. Petitioner has no appeals or proceedings presently pending in any other Court.

5) As set fourth in the accompanying brief's, Petitioner is being detained unconstitutionally because of his conviction and sentence of second degree murder and assault with intent to murder, and felony firearms are invalid based on the following:

6) The juries verdict of guilty of second degree murder, assault with intent to murder, and felony firearms were against the great weight of the evidence, because of the following facts:

a) The evidence clearly shows that only one shooter committed the shooting;

b) The Petitioner was not postively identified until co-defendant Kenneth Tucker was found not guilty on the charge used in the 404B issue;

c)   All statements made by the key witnesses clearly give a different story on all statements.   These witnesses statements and testimony clearly contridicts the evidence found at the scene of both incidents;

d)   The physical evidendenc goes a long way to demolish, not only the credibility of these two witnesses, but as to whether the Petition (or who ever it was) fired shots.

e)   By the laws of physical evidence, it is impossible for two people to fire the same semi-automatic assault weapon;

f)   By the evidence found, the bullets indicate only one shooter for all the casings discovered in both incidents.

7)   The Trial Court errored reversibly in allowing evidence, Pursuant to MRE 404 (B) of a second shooting indicent which was extrinsick to the crime charged, and was so prejudicial to the Petitioner, and lacking probative value as to deny Petitioner a fair trial, thereby depriving Petitioner of due process.

8)   Reversible error occurred where the Petitioner was prevented from a defense, where the defense strategy was directed to exposing the bias motivation of the key witness in changing their story reading the identification of the Petitioner, and where the trial judge narrowly limited defense counsel's presentation of the defense under threat of financial penalty and contempt, by the following facts:

a)   The Petitioner was in the Wayne County Jail eleven months before the witness changed their stories, after Co-Defendant Kenneth Tucker was found not guilty on the Ricardo Mitchell and the James Davis incident;

b)   Mr. Mitchells' defense attorney for co-defendant Kenneth Tucker was threatened by judge when mentioning the aquital of Kenneth Tucker;

c) Where the witness says him, Ricardo Mitchell, and James Davis are all friends and have discussed these incidents together. The witness also mentions that during the trial he was having lunch everyday with these witnesses. It is the Petitioner's belief that the prosecution never had any intention to bring up the second degree murder assault with intent to murder, and felony firearms charge, if co-defendants had not been found guilty of the earlier charge. Petitioner also has had this same charge dismissed. This charge being the assault with intent to murder on James Davis and Ricardo Mitchell.

Petitioner has filed within the one year statute of limitations for habeas corpus action under 28 U.S.C. 2241 and 28 U.S.C. 2254 (D) (1) (A), the Michigan Supreme Court denied Petitioner's Application for leave to appeal on February 4, 2002.

<u>RELIEF SOUGHT</u>

WHEREFORE, Petitioner Arthur D. Smart prays this Honerable Court GRANT the following relief:

a) Accept jurisdiction over this case pursuant to 28 U.S.C. 2254;

b) Require the Respondent to answer the allegations in this Petition and the Pro Per brief in support;

c) Issue an Order that this Court will Grant a Writ of Habeas Corpus unless the State holds a new trial within a specified time;

d) Appoint Counsel to represent Petitioner in this matter;

e) Conduct an evidentiary hearing which would include witness identification, as well as to how many guns were used, because all scientific and physical evidence clearly shows that one gun was used;

f) Issue a Writ of Habeas Corpus freeing Petitioner from his unconstitutional confinement.

Respectfully submitted,

*Arthur Smart*

Arthur D. Smart, No 272101
Petitioner in Pro Per
Ryan Correctiona Facility
17600 Ryan Road
Detroit, Michigan  48212


xc:   File

enclosures

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ARTHUR D. SMART,
        Petitioner,

-vs-

RAYMOND BOOKER, WARDEN,
Ryan Correctional Facility,

        Respondent.
_____/

PRO PER BRIEF IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS

Arthur D. Smart
Petitioner In

## TABLE OF CONTENTS

INDEX OF AUTHORITIES...................... i

STATEMENT OF QUESTIONS PRESENTED............. iii

STATEMENT OF FACTS............... 1-9

ARGUMENTS.........................

### ISSUE I

THE TRIAL COURT ERRED REVERSIBILY IN
ALLOWING EVIDENCE PURSUANT TO MRE 404(b),
OF A SECOND SHOOTING INCIDENT, WHICH WAS
EXTRINSIC TO THE CRIME CHARGED, AND WAS SO
PREJUDICIAL TO THE PETITIONER, AND LACKING
IN PROBATIVE VALUE, AS TO DENY HIM A FAIR
TRIAL, THEREBY DEPRIVING HIM OF DUE
PROCESS.................. 10

### ISSUE II

REVERSIBLE ERROR OCCURRED WHERE THE
PETITIONER WAS PREVENTED FROM PRESENTING A
DEFENSE, WHERE THE DEFENSE STRATEGY WAS
DIRECTED TO EXPOSING THE BIAS MOTIVATION
OF THE KEY WITNESSES IN CHANGING THEIR
STORY REGUARDING THE IDENITIFICATION OF
THE DEFENDANT, AND WHERE THE TRIAL JUDGE
NARROWLY LIMITED DEFENSE COUNSEL'S
PRESENTATION OF THE DEFENSE UNDER THREAT
OF FINANCIAL PENALTY AND CONTEMPT........ 15

### ISSUE III

THE JURY VERDICTS OF GUILTY OF SECOND
DEGREE MURDER, ASSAULT WITH INTENT TO
MURDER, AND FELONY FIREARM WERE AGAINST
THE GREAT WEIGHT OF THE EVIDENCE....... 20

RELIEF SOUGHT.............. 26

PRO PER APPENDIX ..:..................... A-B

PROOF OF SERVICE......................

## INDEX OF AUTHORITIES

<u>CASES</u>

Chambers v Mississippi, 410 US 284; 93 S Ct. 1038;
        35 L Ed 2d 297 (1973)..................................18

Chapman v California, 386 US 18; 87 S.Ct. 824 17 L Ed 705......20

Davis v Alaska, 415 US 308; 94 S Ct. 1105;
        39 L Ed 2d 347 (1974).................................17

Huddleston v United States, 485 US 681; 108 S Ct 1496:
        99 L Ed 2d 771 (1988).................................13

Nagi v Detroit United Railway, 231 Mich 452; 204 NW 126 (1925)..25

Olden v Kentucky, 488 US 227; 109 S Ct 480;
        102 L Ed 2d 513 (1988)................................18

People v Brooks,  453 Mich 511; 557 NW 2d 106 (1996)...........18

People v DeLisle, 202 Mich App 625; 509 NW2d 885 (1994)........25

People v Hampton, 407 Mich 354; 285 NW 2d 284 (1979)...........21

People v Herbert, 444 Mich 466; 511 NW 2d 654 (1993)...........24

People v Houstina, 216 Mich App 70; 549 NW 2d 11 (1996)........16

People v Joyner, 93 Mich App 554; 287 NW 2d 286 (1979) ........16

People v Lemmon, 456 Mich 625; 576 NW 2d 129 ...............21,22

People v Leonard, 224 Mich App 569; 569 NW 2d 663 (1977).......22

People v Mateo, 453 Mich 302; 551 N.W.2d 891 (1996)............26

People v McMillian, 213 Mich App 134; 539 N.W. 2d (1995).......10

People v Nichols, 341 Mich 311; 67 NW 2d 230 (1954)............16

People v Stanaway, 446 Mich 643; 521 NW 2d 557 (1994)......18,19

People v Teague, 411 Mich 562; 309 NW 2d 530 (1981)............19

People v Vandervliet,  444 Mich 52; 508 NW 2d 114 (1993).....12,14

People v Basinger, 203 Mich App 603; 513 NW 2d 828 (1994).......14

US v Merriweather, 78 F 3rd 1070 (CA6, 1996)................10,15

Woodin v Durfee, 46 Mich 424; 9 NW 457 (1881).................24

<u>STATUTES</u>

MCL 750. 227b; MSA 28.424(2)..................................1
MCL 750.317; MSA 28.549......................................1
MCL 750.83; MSA 28.278.......................................1
MCL 769.26; MSA 28.1096....................................16.20
MCL 770.1;MSA 28.1098.......................................21

## CONSTITUTIONAL

US Const. Am. VI. Const. 1963 Art. 1 Sec. 20....................16
US Const. Am. IXV. Const 1963 Art 1 sec 17.............15, 16, 17

## OTHER

FRE 404(b)..........................................................18,20
McCormick, Evidence (3rd ed) 74.2, pg. 179...................23.24
MRE 103.............................................................20
MRE 404.................................................15, 17, 19, 20
MRE 608(b).........................................................24

## STATEMENT OF QUESTIONS PRESENTED

I). DID THE TRIAL COURT ERROR REVERSIBLY IN ALLOWING EVIDENCE, PURSUANT TO MRE 404(b), OF A SECOND SHOOTING INCIDENT, WHICH WAS EXTRINSIC TO THE CRIME CHARGED, AND WAS SO PREJUDICIAL TO THE PETITIONER AND LACKING IN PROBATIVE VALUE, AS TO DENY HIM A FAIR TRIAL, THEREBY DEPRIVIG HIM OF DUE PROCESS?

Petitioner Answers "YES"

II). DID REVERSIBLE ERROR OCCUR WHERE THE PETITIONER WAS PREVENTED FROM PRESENTING A DEFENSE, WHERE THE DEFENSE STRATEGY WAS DIRECTED TO EXPOSING THE BIAS AND MOTIVATION OF THE KEY WITNESSES IN CHANGING THEIR STORY REGARDING THE IDENTIFICATION OF THE DEFENDANT, COUNSEL'S PRESENTATION OF TTHE DEFENSE UNDER THREAT OF FINANCIAL PENALTY AND CONTEMPT?

Petitioner Answers "YES"

III). WHERE THE JURY VERDICTS OF GUILTY OF SECOND DEGREE MURDER, ASSAULT WITH INTENT TO MURDER, AND FELONY FIREARM AGAINST THE GREAT WEIGHT OF THE EVIDENCE?

Petitioner Answers "YES"

## STATEMENT OF FACTS

On August 13, 1998, Defendant Arthur Smart was convicted in a jury trial before the Honerable Gershwin Drain, Judge of Wayne County Circuit Court, Criminal Division, of second degree murder[1], assault with intent to murder[2], and felony firearm[3].

On August 28, 1998, defendant was sentenced to 20 to 40 years each on the murder and assault counts, concurrent, both sentences to run consecutive to a mandatory two years on the felony firearm.  See Judgement of Sentence.

       *        *        *        *

The trial was bifircated.  There were three co-defendants; Kenneth Tucker, Arthur Smart, and Gary Jackson.  Smart and Jackson were tried by a jury, Tucker's trial was conducted simultaneously as a bench trial.  Judge Drain found Tucker not Guilty on 8-11-98. P. 14-15.

       *        *        *

Detroit Police Officer Regina Allen responding to a call at Chene and Garfield in Detroit, in the early morning of December 8, 1996, discovered the body of the decedent, Jermaine Webb in the front seat of a white four door Cadillac.  The body was that of a black male, seated in the driver's side of the vehicle.  There was a large gunshot hole in the right side of his head, and an apparent gunshot wound to the neck.  The car was still running, his foot was on the brakes, the passenger side door was open, and the passenger side window was broken out.

---

1  MCL 750.317; MSA 28.549

2  MCL 750.83; MSA 28.278

3. MCL 750.227b; MSA 28.424 (2)

-1-

She had met Mr. Mitchael Walker at the scene. Some twenty or twenty-five minutes later, Darius Vaughn arrived at the scene. Mr. Vaughn was very excited, speaking really fast, but she could only get from him that he was the passenger, and jumped out of the vehicle. Tr. 8-12-98, P 13-16. Corroboration of this police run was given by Officer Jaimy McCree. At the scene, he spoke with Darius Vaughn and Michael Walker. Mr. Vaughn told him that the shooting was done by persons unknown to him. The Officer received no names of suspects. 8-12-98. 20-25.

Dr. John Somerset, medical examiner testified that Mr. Webb sustained three gunshot wounds to the left side of the head, there were other wounds to the left side of the head, described by the doctor as incised wounds, as if made by the shattered window glass. Cause of death was determined to be multipul gunshot wounds to the head. Tr 8-11-98. 24-28.

Darius Vaughn testified that in the early morning of December 8, 1996, he was with Jermaine Webb, a good friend he had known all his life. Earlier, they had been to a bar, and then to Chinaman's, an after-hours place, arriving around 2 am, staying for a couple of hours, subsequently they went to Wanda Beal's house, leaving after a half-hour or less. They were in a white Cadilac, which Jernaine was driving, Vaughn was in the passenger's seat. 8|11|98. 32-33.

They went on the freeway, exited, and were on Chene. He observed a green-gray Jeep Grand Cherokee, noticing it because he knew Kenneth Tucker to have one. He had known Tucker since the first grade. The Cherokee came off of a side street and was in front of them. Tucker was in the driver's seat, and there were two other people in the vehicle. Arthur Smart and Gary Jackson. He had known both of them for about nine years.

-2-

They passed the Jeep three times–they kept passing each other
(p–60, 61, 68); they got caught by a light at Chene and Forest,
the other vehicle was behind them, and he turned around and saw
Arthur and Gray Jackson outside the Jeep; Tucker remained inside.
Mr. Smart and Mr. Jackson had rifles in their hands. pointed at
the Cadillac.  Several shots were fired, they hit the Cadillac.
At first Mr. Vaughn was ducking down, then he got out and ran
because he was scared for his life.  He ran one block over to
Dubois, to the house of a friend, Michael Walker.  He was
hysterical.  He banged on the door and was let in by Mr. Walker,
whom he had known all his life.  He told Mr. Walker that he and
Jermaine had been shot at, but didn't tell him who it was that had
shot at them.  Before running, he had observed Jermaine in the
driver's seat with his eyes open, his mouth open, his head tilted
back, and not moving.  34–42.

Within minutes, he and Michael Walker went back to the scene
of the shooting.  It was at that time he told Michael that
Kenneth, Gary, and Arthur were involved in the shooting.  When
they returned to the scene, he noted that the car had rolled down
the street, ending up between a church and a store, Jermaine's
window was shot out and he was just laying there, the Jeep was not
there.  42–45.  They began beating on people's doors trying to get
help.  Subsequently he was taken to Police Headquarters–homicide.
He told them at the time he recognized the truck as Kenneth
Tucker's, but he did not recall telling them who was at the scene.
Some time passed before he eventually told the police who had done
the shooting.  48–50

On cross examination by Attorney Karri Mitchell, Kenneth
Tucker's attorney, Darius Vaughn acknowledged the following:

The shooting incident happened around 4:15 or 4:30 in the
morning.  p 54.

-3-

He didn't believe the police officer asked him who did the shooting. 69.

In impeachment, Attorney Mitchell demonstrated that in a statement to a Police Sergeant at homicide the day after the incident, Vaughn told him that he couldn't identify anyone in the Jeep, when shown his statement, on which he corrected the last four lines, he had indicated he did not see who was in the Jeep, but that only Ken Tucker drives his truck. In Court, he stated that he was lying to the Police Officer at the time. P79-80.

Revewing a query by Attorney Mitchell asked on March 2, 1998 (preliminary examination) in sworn testimony, Vaughm (in the instant trial) asnwered yes to the following quoted colloquy:

> "Isn't it true that you were assuming that Kenneth Tucker was driving that truck that night"
>
> Answer-"Yes"
>
> "And your're assuming today ---- meaning March 2, 1998 --- and you are assuming today, aren't you, because you knew that Kenneth Tucker had a Jeep like this and he is the only one that drives his truck, correct. You remember what your answer was? Your answer was correct. Now did you tell the truth on this day?"
>
> The witness answered, yes Tr 8-11-98, p 81

On further cross examination by Attorney Mitchell, Vaughn acknowledged that it wasn't until a year and a half later - February 11, 1998, upon being sought out by the detective, that he said he could identify everybody in the vehicle. Vaughn didn't just get righteous and come down and tell the truth. 86-87.

The witness further acknowledged that fifteen or twenty minutes after the incident,

he had told Officer McCree that he couldn't identify anybody in the vehicle, and reiterated that the next day, when he sat down with the officer he told him he couldn't identify anybody in the vehicle, and that in the March 2, 1998 preliminary examination under oath that he was just assuming that it was Kenneth Tucker. 91-92.

The witness acknowldged that he was a tight buddy and associated with James Davis and Ricardo Mitchell, in fact he had come down to court, and had lunch with them. 93. Also that on the morning of the shooting he had gone to Spencer O'Neal's house, a block away, before coming back to the scene, although he had not testified to that on direct examination. He and Spencer O'Neal, or Ali, drove back to the scene. 94-95.

Gary Jackson's defense counsel, Attorney Susan Rock impeached Witness Vaughn with the fact that in 1995, he had been convicted of the crime of receiving and concealing stolen property over $100. p 108. He was also impeached with the fact that in his statement to police on December 9, 1996 he said he could not see who was firing the shots from the Jeep, but that they came from the passenger side, but that he didn't see the gun, just the fire, 109, also, that on March 2, 1998 when testifying at the preliminary exam, he had ridden to court with James Davis and Ricardo Mitchell, this having occurred twice during the period of the exam. 110.

Michael Walker testified that on December 8, 1996 in the early morning, he was at his girlfriend's house on Dubois in Detroit. He was awakened by rapid gunshots. He heard a car ski out, and within five minutes he heard somebody running up his stairs, then beating on the door and the window. It was "D," Darius Vaughn, whom he has known all of his life. When he let Darius in, Darius was scared, slammed the door and locked it.

-5-

saying he had been shot.  He took off his shirt and coat, and there was a little blood.  He said they killed Juke (Jermaine Webb).  He said K "and them" killed him.  The two of them opened the door, cut through the field, through the alley, down to Forest and Chene, then saw the car which he believed to be Jermaine Webb's.  They beat on doors, trying to get help.  The police having been called, he returned to the scene.  Jermaine then identified Gary and Pee Wee as being invovled, the witness took "Pee Wee" to mean Arthur Smart.  146-154.  On Cross examination, it was revealed that in his subsequent statment to Sergeant Stevenson, after he was taken downtown, Gary Jackson's name was not mentioned as being one of the shooters.  He signed the statement.156-157.  Nor was there anything in the statement to the effect that Pee Wee, or Arthur Smart was one of the shooters. 160-161.

Ricardo Mitchell was called as a witness 8|12|98, p 26.

As a preliminary instruction to Ricardo Mitchell's testimony, the trial judge instructed the jury on the limitations on the extent to which they could consider the witness' testimony reguarding another alledged act that occurred on the night in question, limiting its use only for the purpose of identification, that for example, they must not decide that it shows that the defendants are bad people or likely to commit crimes, and they must not convict any defendant because of some other alleged bad acts.  8/12/98.  26-27

Mitchell testified that around 4:00am on December 8, 1996, he was in front of Margaret Little's house on East Hancock, between Duboise and St. Aubin.  James Davis was with him, and Davis was about to take him home in Davis' truck, which was a blue Chevy Tahoe.  He walked toward the passenger side of the truck. As James got in, Mitchell observed a green Jeep Cherokee pull onto the driver's side of the truck, within about twenty feet,

-6-

he recognized the vehicle to be that of Kenneth Tucker. there were two other peolpe inside the Jeep. Kenneth Tucker was driving. Arthur Smart was in the front passenger seat, and Gary Jackson was on back of him. He had known Smart and Jackson for about five years. Smart's nickname was Pee Wee. Smart and Jackson jumped out of the Jeep, pulled their rifles, and started shooting at James' truck. Mitchell tried to run around the truck to escape the gunfire. Both men had rifles, long guns. All the windows of the driver's side were shot out,, and the back of the driver's window was shot out. The back window and his passenger window was shot out. James, driving, pulled off, and there was more shooting, about two or three seconds. Then the men jumped in the Cherokee and turned right on St. Aubin. Mitchell had gone into the field. James pulled the truck around and got out. Mitchell observed that he was hit, and was bleeding. 27-33.

He talked to the police at the hospital. He was handcuffed and was being asked questions. He was hysterical and shook up by the incident. The police took him to Homicide. He told police the three perpetrators who did it, Arthur Smart, Gary Jackson, and Kenneth Tucker. 33-34.

Cross-examination of Ricardo Mitchell by Mr. Smart's defense counsel, Earsula Johnson brought out the following conflicts in Mr. Mitchell's identification of Mr. Smart.

That in his signed statement to the police on December 8, 1996 he said, "I think it was Pee Wee I saw." 8/12/98, p 66.

That in the signed statement, he said there were two other people who got out of the car who did some shooting, but he did not indicate any of these two people as being Mr. Smart 69.

That he made another statement on February 6, 1997, in which he did not indicate Mr. Smart as being the shooter. 71. He subsequently qualified this by saying he was asked about what Darius had told him. 71.

Police Sergeant Dale Johnston, is an evidence specialist in firearms and explosives, qualified in firearm identification and microscopic comparisons of bullets and casings. 8-12-96, p 85. With respect to the fatal shooting of Jermaine Webb, he received two fired Winchester cartridge casings, 7.62 by 39mm caliber, as well as five fragments of spent bullet bits and pieces. The two fired casings were compared microscopically, and were identified as having been fired in the same weapon. No identification or classification could be made of the fragments. The casings could not be positively identified to type of weapon from which they were fired, but most commonly the type of cartridge is used in the AK and SKA style rifles. These are bolt action rifles. p86.

The Officer was also given four 7.62 by 39mm Winchester cartridges taken from a shooting on East Hancock reguarding James Davis, of which he made a comparison to those from the Jermaine Webb shooting, and found that all of the casings were fired in the same weapon. 87-88.

Called by defense counsel for Gary Jackson, triage nurse Krsiten Hendy testified from the hospital records that she received Ricardo Mitcell at the hospital on December 8, 1996, following the shooting, and that the records indicate dizziness, and indications of alchol use by the patient. She had recorded she was informed he had consumed 24 ounces of beer. 8-12-96, 106-110.

Defense Witness, Latonia Milton testified as an alibi witness for Mr. Smart. She had known Defendant for about seven years, he is the father of her kids. She stated that on the day

-8-

of the events of December, 1996, she remembered that about two that afternoon, she dropped her kids off. At about six, she left with Mr. Smart and went to her cousin Derrick's house, arriving between six-thirty and seven, and stayed there about two hours. When they left, they went to the gas station and were there awhile, because the car wouldn't start. From the gas station, they returned to Derrick's house, staying until maybe eleven-thirty. They returned home about one-thirty and did not leave after that. She is sure that Mr. Smart did not leave. He was home with her the whole time, and she did not leave until between eleven and twelve the next day. They have two children together. They sleep together, and she is not a hard sleeper. If he had left, she would have known it. 8-12-98, 123-128.

ISSUE I

THE TRIAL COURT ERROR REVERSIBILY IN ALLOWING
EVIDENCE PURSUANT TO MRE 404 (b), OF A SECOND
SHOOTING INCIDENT, WHICH WAS EXTRINSIC TO THE
CRIME CHARGED, AND WAS SO PREJUDICIAL TO THE
PEITITIONER AND LACKING IN PAROBATIVE VALUE,
AS TO DENY HIM A FAIR TRIAL, THERBY DEPRIVING
HIM OF DUE PROCESS.

## Standard Of Review

In reviewing this issue of the lower court's decision to
admit evidence of "other crimes, wrongs, or acts" under MRE 404
(b), this Court should follow the standard set fourth in US v
Merriweather, 78 F3d 1070, 1074 (CA 6, 1996). The Court's
evaluation of whether the probative value of the other acts
evidence is not substantially outweighed by its unfairly
prejudicial effect should be reviewed by the appellate court for
abuse of discreation. People v McMillian, 213 Mich App 134, 137;
539 N.W.2d 553 (1995).

## Preservation Of Issue

On June 23, 1998, the Prosecution filed a Motion to allow
evidence of similar act, with respect to the evidence of a second
shooting, which occurred on East Hancock. See Docket entry
6-23-98. Appellate counsel finds nothing in the record to
indicate a hearing and decision or order as to the motion,
however, there is a suggestion in the record that there may have
been some off the record understanding that the judge would allow
the evidence. See Tr 8-10-98, p 8, 9,, where attorney Mitchell,
for defendant Tucker states:

> "The prosecution's gonna be calling Ricardo
> Mitchell and testify to the other AWIM which I
> believe that these two defendants still have
> not even been tried on that case yet, and he
> wants to bring that evidence in this case,
> which you granted, Judge. My client was found
> not guilty in that matter and I believe that
> -- it's not that I belive, that's what started
> the ball rolling. He wants to now preclude

-10-

the jurors from hearing that verdict which
started all of the things, if you will that
the detective did. And I belive that it's the
core of the defendant's case, and I'm arguing
it and I know that the Court has already heard
that my client was found not guilty, but the
complainant indicates on -- the investigator's
report indicates December the 8th, 1996. The
date of the ccomplaint was not filed until
after my client was found not guilty, meaning
that they were gonna charge any of these three
individuals with murder but for the not guilty
verdict for Mr. Tucker."

"The paperework is there, the writing is on
the wall. And for you to preclude us from not
battery (sic), not questioning the detective
and Mr. Vaughn about this, Mr. Vaughn
testified at the preliminary examination that
he didn't even know that Mr. Tucker was found
not guilty until the detectives called him
down there to his office and told em. They
told 'em that they were locked up, that Mr.
Tucker was found not guilty, we want a
statement from you. And but for that
statement and not for that date and that
conversation, we would have here."

Attorney Eursula Johnson, trial defnense counsel for
Defendant Smart joined in this objection, saying:

"Yes, the issue that I have is I object on the
mere fact that you granted a similar act
situation in this case to bring in this
particular case, the AWIM case. All I'm
saying, if the People can bring that in, then
we should be also allowed to bring in saying
the results of that case as it relates to the
one of the co-defendants."

The above colloquy and argument fo to the heart of the two
sides of the 404 (b) issue as it appears in this case, i.e.
probative value vs. prejudice, counsel thereby preserved the issue
for appeal. (the Court denied the requests of defense couusel,
under penalty of contempt and monetary fines, as will be argued in
a later issue herein.)

## Argument

MRE 404[4] on its face has two sides.  First, it is intended to protect defendants from the harm of admission of evidence of a person's character to prove action in conformity therewith. Second, section (b) permits the admission of evidence of other crimes, wrongs, or acts for certain purposes, including identity of perpatrators, as in the instant case.

Further, pursuant to People v Vandervliet, 444 Mich 52, 508 NW2d 114 (1993), the

----

[4]MRE 404 states, in pertinent part:

"MRE rule 404, Character Evidence Not Admissible to Prove Conduct, Exceptions; other Crimes."

"(a) Character evidence gererally.  Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

"(1) Character of accused.  Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same.

＊          ＊          ＊          ＊          ＊

"(b) Other crimes, wrongs, or acts.

"(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may however, he admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such crimes, wrongs, or acts are conterporaneous with, or prior or subsequent to the conduct at issue in the case."

-12-

Michigan Supreme Court undertook to clarify and interpret certain aspects of MRE 404(b) relative to admission of evidence of other crimes, wrongs, or act. In defining the standard by which courts are to be guided by in questions of Rule 404(b) evidence of other wrongful act, the opinion states:

> "...we direct the bench and bar to enploy the evidentiary safeguards already present in the Rules of Evidence, as identified by the unanious United States Supreme Court Decision in Huddleson. [referring to <u>Huddleson v United States,</u> 485 US 681; 108 S.Ct. 1496; 99 L. Ed 2d 771 (1988)]

> "The evidence must be relevant to an issue other than propensity under Rule 404(b) to 'protect against introduction of extrinsic act evidence when that evidence is offered soley to prove character' [citation omitted) Stated otherwise, the prosecutor must offer the other acts under something other than a character to conduct theory.

> "Second, as previously noted, the evidence must be relevant under rule 402, as enforced through Rule 104(b), to a issue or fact of consequence at trial. [Citation omitted).

> "Third, the trial Judge should employ the balancing process under Rule 403 Other acts evidence is not admissible simply because it does not violate Rule 404(b). Rather, a 'determination must be made whether the danger of undue prejudice [substantially] outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decison of this kind under Rule 403.' 28 USCA, p 196, advisory committee notes to FRE 404(b)." 444 Mich at 74-75.

Appellant Smart does not challenge the purpose for which the "other acts" in this case was admitted, rather the challenge goes to the fact that the prejudice is extreme, and outweights the

-13-

probative value.

Prejudice- Standing alone, evidence of Mr. Smart's participation in the Chene incident is nebulous, and unconvincing. Without the connection to the Hancock incident, it is doubful that any jury would convict him of the crimes charged against him. Only by lumping the two incidents together, with reinforcement of the weak identification evidence through the allegations of Ricardo Mitchell that Smart was a shooter in the Hancock incident, could the prosecution buttress the unconvincing (because of the change in stories) testimony to each. He was forced to defend against two crimes, not one, and despite any cautionary instruction by the Court, it was inevitable that the jury would consider him as a bad person, for being in both incidences - the very outcome that Rule 404 was orginally designed to prevent.

The Probative Value, on the other hand was minimal, precisely because of the weakness of the identification testimony in both incidences. If the identification had been strong in both cases, the probative value would be strong. Given the weakness of the identifications, there was little probative value. The lumping together of the two incidents produced a distorted outcome. It is this lumping together of the two crimes which blurs any distinction between two distinctly seperate translators, and allows each case to unduly influence the other. Defendant is seen by the jury to be guilty of two crimes because he is proven to be a "bad person," contrary to the intent of MRE 404.

There is nothing in the record to suggest that the trial judge made the necessasry balancing analysis of prejudice vs probative value, even though the case law requires such balancing. Vandervliet, 444 Mich at 61, 74-75; People v Basinger, 203 Mich App 603, 606; 513 NW2d 828 (1994). The Court erroneously omitted the balancing test.

-14-

Further, in applying the balancing test, the Court must be cautious in limiting the scope of use of the 404(b) evidence.

Appellant refers to <u>US v Merriweather</u>, 78 F3d 1070, 1074 (CA 6 1996); reference to this Sixth Circuit case is appropriate, inasmuch as the Michigan Rule is patterned after FRE 404(b); where <u>Merriweather</u> deals with a case under the federal rule.

The <u>Merriweather</u> opinion undertook to:

> "...explain, once again, the close and careful analysis trial courts should undertake before ruling on the admissibility of evidence of 'other crimes, wrongs, or acts' under Federal Rule of Evidence 404(b)." 78 F3d at 1093.

Defendant believes this is a denial of due process, for which reversal of his convictions, and a new trial is warranted. US Const. Am XIV Const. 1963, Art 1, Sec 17.

-15-

ISSUE II

> REVERSIBLE ERROR OCCURRED WHERE THE DEFENDANT
> WAS PREVENTED FROM PRESENTING A DEFENSE,
> WHERE THE DEFENSE STRATEGY WAS DIRECTED TO
> EXPOSING THE BIAS AND MOTIVATION OF THE KEY
> WITNESSES IN CHANGING THEIR STORY REGUARDING
> THE IDENTIFICATION OF THE PETITIONER AND WHERE
> THE TRIAL JUDGE NARROWLY LIMITED DEFENSE
> COUNSEL'S PRESENTATION OF THE DEFENSE UNDER
> THREAT OF FINANCIAL PENALTY AND CONTEMPT.

## Standard of Review

This issue has to do with the Court's limitation of
counsel's right to elicit evidence in his defense against the
charges. Decisions on admissibility of evidence are reviewed for
abuse of discreation. People v Joyner, 93 Mich App 544; 287 NW 2d
286 (1979). In addition, however, appellate review should
determine whether a substantial right of the defendant is
affected. MRE 103 (A) and (D). MCL 769.26; MSA 28.1096 provides
that setting aside a verdict is permissble in a criminal case on
the basis of an incorrect evidentiary decision where, from an
examination of the entire cause, it affirmatively appears that
such error resulted in a miscarriage of justice. People v
Nichols, 341 Mich 311, 322; 67 NW 2d 230 (1954).

In the instant case, defendant claims a miscarriage of
justice, as well as denial of two constitutionally rights involved
in the right to present a defense - due process and a fair trial,
and the US Sixth Amendment, and the State of Michigan right to
have all issues tried by a jury. US Const. AM XIV, CONST, 1963,
Art 1, Sec 17. US Const, AM VI, Const 1963 Art 1, Sec 20. The
review of this evidentiary error requires a mixed standard of
review, in that the constitutional aspect should be reviewed de
novo. People v Houstina, 216 Mich App 70, 73,; 549 NW 2d 11
(1996).

-16-

## The Right to Present a Defense

The defendant's federal constitutional right to present a defense has been found to be based on the fundemental fairness by the Due Process Clause. <u>Chambers v Mississippi</u>, 410 US 284; 93 S Ct. 1038; 35 L Ed 2d 297 (1973). See also <u>People v Brooks</u>, 453 Mich 511, 521; 557 NW 2d 106 (1996). This issue involves two powerful constitutional rights of the defendant, due process, and the right to trial by jury. Any consideration of making it more difficult to invoke the defense must be balanced against the importance of these important rights. This balancing process was demonostrated by the Michigan Supreme Court, where the right to present a defense is at issue, in <u>People v Stanaway</u>, 446 Mich 643, 726; 521 NW 2d 557 (1994):

> "David v Alaska, supra, while examined as a Confrontation Clause violating affecting testimony at trial, is instructive regarding the requisite standard necessity. The priviledge rule at issue in that case (referring to an evidentiary bar, as in the instant case) was designed primarily, or at least incidentially, to benefit the state rather than to protect a private communication. In addition, the information protected was subjct to disclosure under limited circumstances. Finally, the bar constructed by the juvenile records priviledge deprived the defense of the only opportunity to show the witness' bias and ulterior motive for testifying against the defendant. Id at 316-318; see also Olden v Kentucky, 488 US 227; 109 S. Ct. 480; 102 L Ed 2d 513 (1988). The Court in Davis affirmed thate revealing a wintess' motive for testifying is included within the protected right of cross-examination. As McCormick notes in discussing the case:

>> "In the first instance, it is probable that the defendant's ability to challenge claims of priviledge as impairing his right to present a defense' will to some extent be dependent upon the criticality to that defense of the matter protected by the privilege. In Davis, the privilege matter in effect represented a significant and irreplaceable means of impeaching the chief prosecuting witness.

-18-

> By contrast, where the privileged matter
> desired is of significantly lesser probative
> force or simply cumulative, its denial to the
> defendant has been held not to violate the
> constitutional guarantees. [McCormick,
> Evidence (3rd ed) sub sec 74.2 p 179]"
> Stanaway, at 726.

To repeat, it was not simply a question of inadmissible hearsay, as was contended by the Prosecution, and endorsed by the Court's ruling. The evidence surrounding the Hancock case was not being proposed by defense counsel to prove the truth of the out of court statements (the fact of the acquittal), but to demonstrate the bias and motivation of witness emanating therefrom. When the Court prevented counsel from presenting this aspect of the evidence, the Hancock incident became a one-sided presentation under the umbrella of the 404 (b) rule, which distorted the presentation to the jury, to the extreme disadvantage the defendant.

Nor was it an effort to impeach by extrinsic evidence a collateral matter. The Michigan Supreme Court observed in People v Teague, 411 Mich 562, 566; 309 NW 2d 530 (1981), that Michigan Courts "Have long adheared to the familiar rule that a witness may not be impeached by producing extrinsic evidence of collateral facts." See also MRE 608 (b). A witness' potential bias is, however, not a collateral matter. United States v Abel, 469 US 45, 52; 105 S Ct. 465; 83 L Ed 2d 450 (1984); People v Rosen, 136 Mich App 745, 759; 358 NW 2d 584 (1984). Evidence of the outcome of the Hancock case is evidence of potential bias on the part of the complaining witnesses, and would have been properly introduced to impeach them, Abel, supra at 49, McCormick, Evidence (4th ed abridged) sub sec 39, pg. 52.

The Court's threatened sanctions against counsel were draconian - fines and contempt; the threats placed a serious chill, in fact a ban on counsel's freedom to present the defenses. 8-10-98 p 13, 14..

## The Error is Not Harmless

The Court's ruling was error which resulted in manifest injustice, error which would very likely have made a difference in the outcome of the case. The error cannot be considered harmless, given the fact that the changed stories were directly used by the police and the People, when they at long last instituted charges against the defendants. Without the changed stories, there was no case, therefore the restriction on defendant's right to challenge the bias and motivation was instrumental in bringing about miscarriage of justice. MCL 769.26; MSA 28.1096. Whether the error reguarding the evidentiary restrictions placed on defense counsel is considered to be constitutional, or non-constitutitonal, it should not be considered as harmless, because it cannot be shown that it was harmless beyond a reasonable doubt. Champman v California, 386 US 18; 87 S Ct 824; 17 L. Ed 2d 705 (1967).

ISSUE III

> THE JURY VERDICTS OF GUILTY OF SECOND DEGREE
> MURDER, ASSAULT WITH INTENT TO MURDER, AND
> FELONY FIREARM WERE AGAINST THE GREAT WEIGHT
> OF THE EVIDENCE.

Standard of Review

A trial cour's decison in granting or denying a motion for a new trial is reviewed for abuse of discreation. People v Hampton, 407 Mich 354; 285 NW 2d 284 (1979). People v Leonard, 224 Mich App 569, 580;  569 NW2d 663 (1997). "Where the reasons given by the trial court are inadequate or not legally recognized, the trial court abused its discretion." Id

In People v Lemmon, 456 Mich 625, 636;  576 NW2d 129 (1998), the Michigan Supreme Court held that in considering a Motion for New trial on the basis that the verdict is against the great weight of the evidence, a trial judge may not sit as a 13th juror reguarding witness creditbility, and therefore may not grant a new trial on the ground that "he disbelieves the witnesses for the prevailing party."  However, the Supreme Court held that a trial court may still grant a new trial on the ground that the verdict is against the great  weight of the evidence, "where the evidence preponderates heavily against the verdict" so that it would be a miscarriage of justice to allow the verdict to stand.  Lemmon, Supra, 627.  See also MCL 770.1; MSA 28.1098.

Preservation of Issue

After the trial, prior to sentencing, defense counsel Johnson moved for a Judgement Notwithstanding the Verdict, or in the Alternative a New Trial.  in open Court, Counsel asserted that "The verdict that came down from the jury was against the great weight of the evidence."  Tr 8/28/98, Motion and Sentence, p.2 The Court denied the Motion 4.

Argument

Defendant-Appellant Smart claims that the evidence in his case does "preponderate heavily against the verdict," and that a miscarriage of justice occurred. Lemmom, supra.

In the trial there was a confluence of evidentiary factors which led to a distorted verdict by the jury.

A.    Under the umbrella of the "404(b) evidence rule, Defendant was forced to defend against two shootings, although only charged with one.

B.    The trial judge sharply curttailed defense counsel's ability to structure the defense against questionable identifying witnesses, under threat of contempt and financial sanctions.

The Background of the People's Case

In the early morning hours 'of December 8, 1996, around 4:00 to 5:00am, two seperate shootings occurred in an eastside neighborhood of Detroit, the shootings had marked similarities; the victims of the respective shootings were well aquainted with each other, the two incidents were linked by the identification of fired cartridge casings, as being perpetrated with the same weapon, one rifle only.   The shooting in the instant case was on Chene, in the vicinity of Forest; the second shooting, less than an hour later was on East Hancock, within blocks of the first shooting.

The police experienced difficulty in brining charges in the first case because of the questionable identification, or lack of ability of the victims, in their statements to the police to identify the perpatrators.   None of the three co-defendants in this case were charged until February of 1998.   At that, following the acquital of Kenneth Tucker in the East Hancock shooting, in a bench trial before the Honerable Carole F. Youngblood of the Wayne

County Docket No. 97-000136-01. The Police re-investigated, stories changed and the charges were filed.

The Instant Case-The Chene Incident

While Defendant Smart and his Co-defendant Gary Jackson were convicted in the instant case by the jury, the co-defendant Kenneth Tucker was simultaneously acquited in his bench trial by Judge Drain; the witness and the evidence were essentially the same.

Thus, two acquittals by trial judges, on essentially the same facts and the same witneeses stand in stark contrast to the convictions of Smart and Jackson by a jury.

Appellant attributes this anomaly to two principal factors - (1) the lumping together of the two incidents under the 404 (b) evidentiary umbrella, and (2) the sharp limitation of the defendant's ability to bring to the jury the facts, after the acquittal by Judge Youngblood, relating to intensified efforts by police to re-interview the witnesses in order to put together a second case, as well as the motivation of the victim/witnesses themselves to refashion their testimony in order to convict on the Chene incident, having seen the failure of the People in their efforts to obtain a conviction on the Hancock incident. The Court used a coercive threat of financial sanctions, and citation for contempt in forebidding any reference by counsel to events surrounding the Hancock acquital.

In reguard to modifications of their testimony by the victim/witnesses, it should be noted that neither of the eyewitnesses to the shootings who testified at the trial, i.e. Darius Vaughn and Ricardo Mitchell, were able to identify the shooters to the police at the time they gave their statements, immediately after the shootings. Mitchell, in reguard to the

Hancock incident said, only "I think it was Pee Wee I saw." Appellant questions the propriety of a murder conviction based on such a tenuous statement of identification. It was only later, in the trial court that these witnesses changed their testimony and made specific identifications.

In seperate issues in this appeal, Defendant Smart challenges not only the limitations placed in the defense described above, he also challenges the use of the Hancock incident as being to prejudicial in the 404(b) context. However, for the present argument on the great weight of the evidence, it is appellant's position that these factors provide a compelling foundation for a finding by this Court that the Tail Court abused its discreation in failing to grant a new trial, and that a manifest of injustice occurred.

Appellant argues that the factors cited herein demonstrate that the jury arrived at a "preverse" verdict which must be reveresed.

The standard for considering a challenge to a conviction based on the great weight of the evidence was articulated in People v Herbert, 444 Mich 466, 476; 511 NW 2D 654 (1993).

> "To determine whether a verdict is against the great weight of the evidence, or has worked an injustice, a judge necessarily reviews the whole body of proofs. Thus Justice Cooley explained in Woodin v Durfee, 46 Mich 424, 427 9 NW 457 (1881), that while jurors' may disbelieve the most positive evidence, even when it stands uncontradicted, and the judge cannot take from them their right of Judgmemt.' the Judge may set aside 'a preverse verdict' and grant a new trial.".

Other language in Herbert, suggesting that the Trial Judge may act as a "thirteeth juror" was overruled in Lemmon, thus the emphasis is placed on the principal cited above, that a new trial may be granted, "Only if the evidence preponderates heavily

-24-

against the verdict so that it would be a miscarriage of justice to allow the verdict to stand."

Michigan Case Law has stated that a verdict may be vacated as against the Great Weight of the Evidence when it "Does not find reasonable support in the evidence, but is more likely to be attributed to causes outside the record such as passion, prejudice, sympathy, or some extraneous influence." People v DeLisle, 202 Mich App 625, 658, 661; 509 NW2d 885 (1994), quoting Nagi v Detroit United Railway, 231 Mich 452, 457; 204 NW 126 (1925).

Such is the case here. The bias and motivation to lie is implicit in the universally altered stories of all the witnesses, stimulated by the initiatives of the police in "re-investigating" the case, after the first aquittal of Kenneth Tucker. The inference of "cooked up" stories by the disappointed victims is compelling. The nebulous innuendos and the twists and turns which were present in the witness/victim testimony are indicative of a bias that operated as an outside factor in bringing the jury to an unreasonable finding of guilt.

The Bullet Casings

Equally compelling is the bullet casing evidence provided by Police Sergeant Johnston, to the effect that all bullet casings discovered came from a single rifle. The physical evidence directly contradicts trial testimony by both Darius Vaughn and Riacrdo Mitchell to the effect that, in both shooting incidents, there were two shooters with rifles, firing away. This physical evidence goes a long way to demolish, not only the credibility of the testimony of these two witnesses as to who the shooters were, but raises a question as to whether either Smart or Jackson (or whoever it was) fired shots. Two witnesses were described as

-25-

shooting - the bullets indicates only one shooter for all of the
casings discovered in both incidents.

If considered not-constitutional., the "miscarriage of justice"
standard of review should apply, and the error should be viewed in
light of the absence of other evidence of significant weight and
strength.    People v Mateo, 453 Mich 203, 215; 551 N.W.2d 891
(1996).

    Accordingly, Petitioner's conviction's should be reveresed,
and a new trial granted.

                              Respectfully submitted,

                              _____


Dated  /  /  8  /2003

-26-

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARTHUR D. SMART

    Petitioner,

-VS-                                  Case No:_____

Raymond Booker, WARDEN
Ryan Correctional Facility,

    Respondent.

_____/

PRO PER APPENDIX AND DESIGNATION OF CONTENTS

DESIGNATION                                    APPENDIX ITEM

APPENDIX A                COURT OF APPEALS OPINION (6-19-01)

APPENDIX B                MICHIGAN SUPREME COURT ORDER (2-4-02)

BY: ARTHUR D. SMART NO:272101
    DEFENDANT IN PRO PER
    17600 RYAN ROAD
    DETROIT, MICHIGAN 48212

APPENDIX A
COURT OF APPEALS OPINION (6-19-01)

# STATE OF MICHIGAN

# COURT OF APPEALS

DEFENDANTS COPY

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

ARTHUR SMART,

      Defendant-Appellant.

UNPUBLISHED
June 19, 2001

No. 214712
Wayne Circuit Court
LC No. 98-002820

Before: Bandstra, C.J., and Griffin and Collins, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of second-degree murder, MCL 750.317, assault with intent to commit murder, MCL 750.83, and possession of a firearm during the commission of a felony, MCL 750.227b. Defendant was subsequently sentenced to serve concurrent terms of twenty to forty years' imprisonment for his murder and assault convictions, to be preceded by the mandatory two-year sentence for felony-firearm. Defendant appeals as of right. We affirm.

This case arises from the early morning shooting death of Jermaine Webb on December 8, 1996. According to testimony at trial, at approximately 4:15 a.m., Webb and a passenger, Darius Vaughn, were stopped at an intersection in the city of Detroit when they were fired upon by two men who had been traveling along side Webb's vehicle in a green Jeep Cherokee. Vaughn, who was able to escape from the vehicle during the shooting and flee to the nearby home of Michael Walker, testified that he had recognized defendant, whom he had known for several years, as one of the two gunmen who had left the Jeep and fired a rifle at Webb's vehicle. Vaughn further testified, however, that although he similarly recognized Kenneth Tucker as the driver of the Jeep, and Gary Jackson as the second gunman, he did not relay this information to police on the day of the shooting because he feared for his life.[1] In fact, it was not until February 11, 1998, when police contacted Vaughn for additional questioning, that he affirmatively identified the three occupants of the Jeep on the night of the shooting.

---

[1] Vaughn did, however, inform police at that time that he believed the Jeep belonged to Tucker, and that "only Ken Tucker drives his truck."

Defendant, Jackson, and Tucker were thereafter each charged with first-degree murder and assault with intent to commit murder. Defendant and Jackson, who were also charged with felony-firearm, were tried before the same jury and ultimately convicted of second-degree murder, assault with intent to commit murder, and felony-firearm. Tucker, although jointly tried with defendant and Jackson, was tried before the bench and acquitted of all charges.

I

We first address defendant's argument that the trial court abused its discretion in admitting testimony concerning defendant's involvement in a second shooting alleged to have occurred only a short time after the attack upon Webb and Vaughn. Under MRE 404(b)(1), evidence of such other acts may be admitted if it is offered for a proper purpose, it is relevant to an issue or fact of consequence at trial, and its probative value is not substantially outweighed by its potential for unfair prejudice. *People v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993), mod 445 Mich 1205 (1994). A proper purpose is one other than establishing the defendant's character to show his propensity to commit the offense. *People v Crawford*, 458 Mich 376, 390; 582 NW2d 785 (1998).

In this case, Ricardo Mitchell was permitted to testify that approximately twenty-five minutes after the shooting which took Webb's life, he and his friend James Davis were about to enter Davis' vehicle when Tucker pulled alongside them in his green Jeep Cherokee. According to Mitchell, Tucker remained behind the wheel as defendant and Jackson, both of whom he had known for a number of years, left the Jeep and fired at him with rifles.[2]

The trial court admitted Mitchell's testimony on the issue of identification and in doing so squarely cautioned the jurors that the testimony was not to be used for any other purpose. On appeal, defendant does not dispute the propriety of the purpose for which the testimony was offered, or argue that the testimony was not relevant to an issue of consequence at trial. Rather, defendant asserts that the probative value of the testimony was outweighed by its prejudicial effect, and that the trial court therefore erred in admitting the testimony at trial. We do not agree.

The issue of identification was contested by defendant, who claimed that he was home with his girlfriend at the time of the shootings. Consequently, the prosecutor was required to support Vaughn's identification of defendant as one of the two gunmen who fired upon Webb's vehicle. Given the lack of physical evidence in support of Vaughn's identification, Mitchell's testimony was highly probative on this issue. Although this evidence may have also prejudiced defendant to some extent, we do not believe that such prejudice required that the testimony be precluded. Under MRE 403, the prejudice required inures only when it appears that marginally probative evidence will be given undue or preemptive weight by the jury. *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995). Here, given the factual and spatial similarities between the shootings, as well as the fact that both Vaughn and Mitchell positively identified defendant on the basis of previous relationships, the other acts

---

[2] In a bench trial related to that incident, Tucker was found not guilty of assault with intent to murder.

evidence was not just marginally probative, it was highly probative of defendant's identity as one of the two shooters involved in the attack upon Webb and Vaughn. When viewed in connection with the expressly limited purpose for which the trial court admitted the testimony, we cannot conclude that the prejudicial effect of the testimony substantially outweighed its probative value.

Accordingly, we find the similar act testimony to have been properly admissible under MRE 404(b), and that the trial court therefore did not abuse its discretion in admitting the testimony at trial.

## II

Defendant next argues that the trial court erred in excluding evidence of Tucker's acquittal in the earlier trial concerning the shootings involving Mitchell and Davis. In doing so, defendant's asserts that the trial court's decision in this regard deprived him of the right to present a defense on the theory that following Tucker's acquittal, Vaughn, who was a friend of both Mitchell and Davis, had motive to ensure a conviction in the instant case by untruthfully identifying defendant and the others as those who attacked he and Webb.

The credibility of a witness is an issue that is of the utmost importance in every case and thus as part of a defendant's constitutional right to present a defense, he is guaranteed a reasonable opportunity to test the truthfulness of each witnesses' testimony. *People v Posby*, 227 Mich App 219, 226; 574 NW2d 398 (1997); *People v Adamski*, 198 Mich App 133, 138; 497 NW2d 546 (1993). In this case, however, the fact that Vaughn failed to initially identify his attackers during police questioning on the morning of the shooting was seriously examined during Vaughn's cross-examination, as was both his close friendship with Mitchell and Davis, and the fact that more than one year had passed before he specifically informed the police of the identity of those involved in the shooting in which Webb was killed. Vaughn's contention that he did not inform police for such an extensive period of time because he was afraid of these three codefendants was also strongly attacked. On this record, we cannot say that defendant was denied his right to present his defense that Vaughn was untruthful. *Adamski, supra.* Accordingly, we find that because defendant was afforded a reasonable opportunity to attack the credibility of Vaughn's identification despite being precluded from referring to the subject verdict, no error requiring relief has been shown. MCR 2.613(A); see also *People v McIntire*, 232 Mich App 71, 102-103; 591 NW2d 231 (1998) (finding that where the inference was clearly raised, additional evidence demonstrating bias was of only marginal value), rev'd on other grounds 461 Mich 147 (1999).

## III

Defendant finally argues that the trial court abused its discretion in denying his motion for a new trial on the basis that the verdict was against the great weight of the evidence. This Court reviews the trial court's denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence for an abuse of discretion. *People v Stiller*, 242 Mich App 38, 49; 617 NW2d 697 (2000). The test is whether the evidence preponderates so heavily against the verdict that it would be an miscarriage of justice to allow the verdict to stand. *People v Gadomski*, 232 Mich App 24, 28; 592 NW2d 75 (1998).

Defendant asserts that Tucker's acquittal by the bench in both the earlier and the instant matter, when coupled with the allegedly inconsistent and contradictory testimony of various prosecution witnesses, preponderates heavily against the jury's finding of guilt. We disagree.

Initially, we note that inconsistent verdicts between codefendants furnish no reason for reversing the judgment against a defendant found guilty upon sufficient evidence. See, e.g., *People v Monasterski*, 105 Mich App 645, 659-660; 307 NW2d 394 (1981). This is especially true where, as here, the evidence adduced against one defendant was different from or weaker than that adduced against the other. As noted by the trial court in denying defendant's motion, there were marked differences in the evidence concerning the actions of each of these two defendants. Although the evidence did show that both defendants were present at the scene, Tucker, unlike defendant, was not implicated as one of the two gunmen who fired upon Webb's vehicle. Given this rather weighty distinction, we find the fact that Tucker was not similarly convicted of the charged crimes to be of no relevance to the verdict against defendant.

We further reject defendant's contention that the verdict was against the great weight of the evidence because the testimony of prosecution witnesses was inconsistent and contradictory. In making this argument defendant asserts that because both Vaughn and Mitchell failed to initially identify their assailants to police, their later statements and testimony implicating defendant were not sufficiently credible to support his conviction. However, motions for a new trial that implicate witness credibility are not favored, *People v Lemmon*, 456 Mich 625, 638-639, 642; 576 NW2d 129 (1998), and a trial judge may not grant a new trial simply on the basis of a disagreement with juror assessment of credibility. *Id.* at 627, 640. To the contrary, such motions should be granted only in exceptional cases, such as where a witness' testimony has been "seriously impeached and the case marked by uncertainties and discrepancies." *Id.* at 642-644. Here, we find that the record demonstrates no such exception.

Contrary to defendant's argument, Mitchell clearly informed police of the identities of each of the three individuals involved in the second shooting only shortly after the event. Moreover, given Vaughn's explanation that his failure to initially inform police of the identity of the shooters was motivated by fear, as well as the fact that Walker clearly indicated during his testimony that Vaughn had told him of each of the codefendants' involvement in the shooting that same morning, we do not believe that Vaughn's testimony had been so "seriously impeached" as to leave "the case marked by uncertaint[y]." *Id.*

We likewise reject defendant's assertion that both Vaughn and Mitchell's testimony indicating that there were two gunmen contradicted the physical evidence offered by the firearms expert who testified on behalf of the prosecution at trial. Although defendant is correct that this expert determined that each of the six cartridges found at the scenes were fired from the same rifle, this fact does not necessarily foreclose the possibility of a second weapon, which perhaps does not eject its spent casings, being fired at the scene. Moreover, the expert further testified that in addition to the spent cartridges, several bullet fragments which could not be connected to a specific weapon were recovered from these scenes. Given that "different minds [c]ould

-4-

naturally and fairly come to different conclusions" as to facts established by such evidence, we find that the trial court correctly declined to disturb the jury's verdict. *Id.* at 645.

We affirm.

/s/ Richard A. Bandstra
/s/ Richard Allen Griffin
/s/ Jeffrey G. Collins

APPENDIX B
MICHIGAN SUPREME COURT OPINION (2-4-02)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED